1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                        NORTHERN DISTRICT OF CALIFORNIA

10                              San Francisco Division

11    A.J. CALIFORNIA MINI BUS, INC. d/b/a        Case No. 3:15-cv-03218-LB
      AIRPORT EXPRESS,
12                                                **ORDER GRANTING THE**
                    Plaintiff,                    **DEFENDANTS' MOTION TO DISMISS**
13                                                **THE PLAINTIFF'S COMPLAINT**

          v.                                      [Re: ECF No. 12]
14
      AIRPORT COMMISSION OF THE CITY &
15    COUNTY OF SAN FRANCISCO, and
      JOHN L. MARTIN, in his capacity as
16    Airport Director of San Francisco
      International Airport,
17
                    Defendants.
18

19                                **INTRODUCTION**

20         San Francisco International Airport ("SFO") uses a zone system (essentially, dedicated areas)

21    that shared-ride van services (such as the plaintiff Airport Express) must use to pick up and drop

22    off passengers at the airport. (Complaint, ECF No. 1, ¶ 2.[1]) Airport Express sued the Airport

23    Commission and SFO Airport Director John Martin for injunctive and declaratory relief, claiming

24    that the zone system discriminates against Airport Express in favor of certain of its competitors

25    without any rational or legitimate basis for doing so, in violation of Airport Express's substantive

26    due-process and equal-protection rights under the Fourteenth Amendment to the U.S. Constitution.

27    _____

28    [1] Record citations are to documents in the Electronic Case File ("ECF")'; pinpoint citations are to
      the ECF-generated page numbers at the tops of the documents.

      ORDER (No. 3:15-cv-03218-LB)

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10

(*Id.* ¶¶ 68-85.) The defendants moved to dismiss the complaint on two grounds: 1) the system has been in place for 20 years, and thus the lawsuit is untimely and barred by the two-year statute of limitations; and 2) the zone system is rationally related to legitimate government interests of controlling curbside crowding, traffic congestion, space allocation, and consumer access to van services, and thus the complaint fails to state claims under the Due Process or Equal Protection Clauses of the Fourteenth Amendment. (*See* Motion, ECF No. 12 at 7.) Airport Express challenges only the continued operation of the zone system, and thus the court concludes (and the defendants ultimately do not dispute) that the statute of limitations does not bar the claims. But because the court concludes that the zone system is rationally related to legitimate government interests, the court grants the defendants' motion to dismiss.

11

**STATEMENT**[2]

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

San Francisco International Airport is the seventh largest airport in the United States, with more than 47 million passengers arriving and departing in 2014. (Complaint, ECF No. 1, ¶ 13.) Shared-ride van service companies play an important role in providing efficient, reliable, and economical transportation to and from SFO, carrying more than a million residents and visitors each year. (*Id.*) Airport Express (a family-owned, local business for more than 30 years) is one of ten companies that provides shared-ride van services to and from SFO; it provides services between San Francisco and SFO, operates under a non-exclusive operating permit issued by the Airport Commission, and is authorized by that permit to operate 20 vans. (*Id.* ¶¶ 1, 9, 12, 14.) The Airport Commission, which is a department of the City and County of San Francisco, also issued non-exclusive permits to nine other companies: Advanced Airport Shuttle, American Airporter Shuttle, GO Lorrie's Airport Shuttle, Pacific Airport Shuttle, Peter's Airport Shuttle, Quake City Shuttle, San Francisco City Shuttle, South and East Bay Shuttle, and SuperShuttle. (*Id.* ¶¶ 10, 14.) The ten permits contain identical terms and conditions, and no provisions in the permits allow the Airport Commission or the Airport Director to favor one van service over the others or to treat companies differently. (*Id.* ¶ 14.)

27
28

[2] The allegations in this section are from the complaint.

United States District Court
Northern District of California

1   The Airport Commission also has issued Rules and Regulations governing the general conduct

2   and activities of the public, tenants, employees and commercial users of SFO. (*Id.* ¶ 15.) The

3   Airport Director is charged with enforcing the Airport Commission's Rules and Regulations. (*Id.*)

4   No provisions in the SFO Rules and Regulations allow the Airport Commission or the Airport

5   Director to favor one van service over the others or to treat companies differently. (*Id.*)

6          More than twenty years ago, the Airport Commission and Airport Director decided to attempt

7   to lessen competition among the shared-ride van services operating at SFO by first freezing and

8   then trying to dramatically reduce the number of companies that would be permitted to operate at

9   SFO. (*Id.* ¶ 16.) In 1993, the Airport Commission issued a moratorium on new permits for

10  additional shared-ride van services, thus freezing the number operating at SFO to 13, which

11  subsequently became the ten services operating now. (*Id.* ¶ 17.) Later in 1993, the Airport Director

12  implemented a request-for-proposal ("RFP") process to eliminate all shared-ride van services

13  operating at SFO except for SuperShuttle and GO Lorries. (*Id.* ¶ 18.) This process was

14  unsuccessful; members of the San Francisco Board of Supervisors and the Airport Commission

15  insisted that any plan include the other shared-ride van services operating at SFO. (*Id.*) In response

16  to this, the Airport Director established the three-zone system that Airport Express challenges as

17  discriminatory. (*Id.*)

18         In 2003, the Airport Director implemented another RFP process to reduce the number of

19  shared-ride van services from 11 to five. (*Id.* ¶ 19.) In 2008, he tried again with another RFP

20  process to reduce the number to three van services. (*Id.* ¶ 20.) Both efforts to reduce competition

21  at SFO were unsuccessful. (*Id.* ¶¶ 19-20.)

22         Because this formal (though biased) process did not work, the Airport Director − with the

23  Airport Commission's approval − adopted and enforced procedures, rules, charges, and fines that

24  favor certain van services (primarily SuperShuttle) to the economic and business detriment of

25  Airport Express. (*Id.* ¶ 22.) In particular, the Airport Director implemented and still uses a three-

26  zone system that the ten shared-ride van service companies must use at all SFO terminals. (*Id.* ¶

27  23.) It openly and undisputedly favors certain of the van services, primarily SuperShuttle. (*Id.*)

28  The three-zone system raises costs for the shared-ride van services and SFO passengers, treats the

United States District Court
Northern District of California

1  van companies unequally and unfairly, and has been criticized openly by SFO's own independent

2  consultant. (*Id.*)

3       The complaint's allegations about the zone system and related rules can be divided into six

4  parts: 1) curb-space allocations at the terminals; 2) departure times; 3) allocation of walk-up

5  customers; 4) ability to loop the terminals; 5) operation of the van coordinators; and 6) the

6  negative impact on Airport Express (including allocation of costs and the effect on passenger

7  numbers transported from SFO).

8  **1.  Curb-Space Allocations**

9       SFO has four terminals: Terminal One (primarily serving Delta and Southwest), Terminal Two

10  (American and Virgin America), Terminal Three (United), and the International Terminal (Alaska,

11  JetBlue, and more than 30 international carriers). (*Id.* ¶ 24.) There are three color-coded zones

12  (blue, red, and yellow) outside of each terminal for shared-ride van companies. (*Id.*) The three

13  zones are separate from each other at Terminals One and Three; they are contiguous at Terminal

14  Two and the International Terminal (also known as Terminal Four). (*Id.*) The blue zone is

15  reserved exclusively for SuperShuttle, and the red zone is exclusively for GO Lorries and

16  American Airporter. (*Id.* ¶ 25.) Airport Express shares the yellow zone with five other companies

17  that serve San Francisco and one company that serves the south and east bay. (*Id.*)

18       The zone allocations might be fair and reasonable if the yellow zones at each terminal were

19  large enough to allow the companies that share them to be treated the same as SuperShuttle in the

20  blue zone and the two red-zone companies. (*Id.* ¶ 26.) They are not. (*Id.*) The yellow zone is the

21  smallest at each terminal. (*Id.*)

22       At Terminal One, the blue zone has two spaces for SuperShuttle, and the red zone has two

23  spaces (one each for the two companies). (*Id.* ¶ 27.) The yellow zone has three spaces, but one

24  space is reserved for the company serving the south and east bay, and another space can be

25  occupied by the next-in-line SFO-bound van (but it may not pick up passengers). (*Id.*) Thus, there

26  is only one space in the yellow zone at Terminal One for active SFO-bound use, and Airport

27  Express must share it with five other companies. (*Id.*)

28       At Terminal Two, the blue zone has three spaces, and the red zone has two spaces; Airport

Express must share one space in the yellow zone with the five other companies servicing SFO-bound passengers. (*Id.* ¶ 28.) At Terminal Three, the blue zone has two spaces, and the red zone has two spaces; Airport Express must share one space in the yellow zone with the five other companies servicing SFO-bound passengers. (*Id.* ¶ 29.) At the International Terminal, the blue zone has three spaces, and the red zone has two spaces; Airport Express must share one space in the yellow zone with the five other companies servicing SFO-bound passengers. (*Id.* ¶ 30.)

In total, at any given time, SuperShuttle has ten spaces available in the blue zones to pick up passengers at SFO and could have that many vans parked at the terminals waiting for customers. (*Id.* ¶ 31.) GO Lorries and American Airporter have eight spaces available in the red zones to pick up passengers at SFO and could each have four vans parked at the terminals waiting for customers. (*Id.*) By contrast, Airport Express must share the four spaces available in the yellow zones with five other companies, which means that at any given time, Airport Express may not have any vans parked at SFO or will at most have one in rotation with the other five companies. (*Id.*) The result is that the zone-space allocations are inherently discriminatory towards Airport Express based just on their relative size. (*Id.* ¶ 32.)

## 2.   Departure Times

The Airport Director's rules about departure time make the zone-space allocations worse because the blue-zone and red-zone companies can have more vans per hour cycle through SFO. (*Id.*) Blue-zone SuperShuttle vans must depart within 15 minutes after the first passenger boards; if SuperShuttle fills its ten spaces and has passengers boarding regularly, it could have as many as 40 vans per hour cycle through SFO picking up passengers. (*Id.*) In the red zone, vans must depart within 20 minutes after the first passenger boards; if the two companies operating there (each with four spaces) fill their spaces and have passengers boarding regularly, each could have as many as 12 vans per hour cycle through SFO picking up passengers. (*Id.*) In the yellow zone, vans must depart within 20 minutes after the first passenger boards; if the six companies fill the four spaces and have passengers boarding regularly, at most Airport Express could have two vans (or possibly three depending on its place in the yellow zone rotation) per hour cycle through SFO picking up passengers. (*Id.*) Thus, for every Airport Express van allowed to pick up passengers at SFO,

ORDER (No. 3:15-cv-03218-LB)

SuperShuttle can have 20 vans, and the red-zone companies GO Lorries and American Airporter each can have six vans. (*Id.*)

The operating statistics for the companies support the conclusion of relative advantage. (*Id.* ¶ 33.) In 2011, SuperShuttle had an average of 935 passengers per day traveling from SFO and 946 traveling to SFO, GO Lorries had an average of 238 per day traveling from SFO and 392 traveling to SFO, and American Airporter had an average of 174 per day traveling from SFO and 168 traveling to SFO. (*Id.* ¶¶ 33-34.) Airport Express had an average of only 24 per day traveling from SFO. (*Id.* ¶ 33.) But without the restraints imposed by the three-zone system, Airport Express had an average of 464 passengers traveling to SFO (more than the red-zone companies and almost half of SuperShuttle's numbers with only a sixth of the vans). (*Id.* ¶ 34.)

What this means is that on a per-van basis, Airport Express has more passengers traveling to SFO than every company, including SuperShuttle (which is six times larger). (*Id.* ¶ 35.) In 2011, per van, Airport Express had 8,462 passengers traveling to SFO, SuperShuttle had 2,763, GO Lorries had 3,870, and American Airporter had 2,937. (*Id.*) The from-SFO per-van numbers are relatively equal for the other companies: 2,731 for SuperShuttle, 2,345 for GO Lorries, and 3,017 for American Airporter. (*Id.* ¶ 36.) But Airport Express's from-SFO per-van numbers are only 436, a statistic that shows that Airport Express is a viable competitor and that the three-zone system at SFO discriminates against Airport Express. (*Id.* ¶¶ 36-37.)

In addition, because the spaces in the blue zone are allocated just to SuperShuttle, its vans have to move only if a passenger has actually boarded and more than 15 minutes have passed. (*Id.* ¶ 38.) In other words, the vans can sit at the terminals waiting for passengers and never have to depart completely empty. (*Id.*) This is not true for the other two zones. (*Id.*) In the red zone, GO Lorries and American Airporter vans must move from terminal to terminal every five minutes, regardless of whether a passenger has boarded; if their vans get through Terminal Four without picking up a passenger, they must return to the off-site staging area and get back in the red-zone line to repeat the entire process. (*Id.*) Similarly, vans in the yellow zone must move from terminal to terminal every five minutes, regardless of whether a passenger has boarded; if their vans get through Terminal Four without picking up a passenger, they too must return to the off-site staging

United States District Court
Northern District of California

1   area and get in the yellow-zone line. (*Id.*) The process is even slower than in the red zone because

2   there are three times as many companies in the yellow-zone line at the staging area. (*Id.*)

3   **3.   Allocation of Walk-Up Customers**

4       The zone system allocates walk-up customers differently among the different van service

5   companies. (*Id.* ¶ 39.) Walk-up customers without a reservation or preference for a specific

6   company are assigned on a rotating basis among the three zones. (*Id.*) If three passengers arrive,

7   the first will be allocated to the blue zone, the second to the red zone, and the third to the yellow

8   zone. (*Id.*) This means that SuperShuttle always gets one of every three walk-up customers, GO

9   Lorries and American Airporter each get one of every six walk-up customers, and Airport Express

10  gets one of every 18 walk-up customers. (*Id.*) Because SuperShuttle may have multiple vans

11  waiting at SFO at any given time, it also can allocate customers based on their final destination in

12  San Francisco; this allows it to operate more efficiently than Airport Express, which must take any

13  passengers heading anywhere in San Francisco. (*Id.* ¶ 40.) For example, SuperShuttle can group

14  passengers heading to the Sunset and Outer Richmond in one van and passengers heading to the

15  Financial District in another; Airport Express must put all in one van, which benefits neither

16  passengers nor Airport Express. (*Id.*)

17  **4.   Ability To Loop the Terminals**

18      Only SuperShuttle is allowed to loop among the terminals. (*Id.* ¶ 41.) A SuperShuttle van can

19  go to the terminals out of order and can circle back to a terminal it passed earlier to pick up

20  passengers. (*Id.*) By contrast, if an Airport Express van is at Terminal Three and a customer with a

21  reservation for Airport Express arrives at Terminal One, the Airport Express van cannot circle

22  back to Terminal One to pick up that passenger. (*Id.*) Instead, Airport Express must send a

23  separate van just for that one passenger. (*Id.*) And the second van is not allowed to stop at any

24  other terminals to pick up any other passengers; this ensures that the second van will lose money

25  on that trip because one passenger is not enough to cover all of SFO's costs and charges on top of

26  the costs of operating the van to and from San Francisco. (*Id.*)

27      SuperShuttle's ability to loop among the terminals results in two benefits that allow

28  SuperShuttle to operate more economically and efficiently than Airport Express: 1) it makes it far

United States District Court
Northern District of California

more likely that SuperShuttle vans will leave SFO with more passengers in each van; and 2) it provides SuperShuttle with yet another way to allocate customers depending on their final destination in San Francisco. (*Id.* ¶ 42.)

**5.  Operation of the Van Coordinators**

The van coordinators at SFO work for a private company. (*Id.* ¶ 43.) Van coordinators in the red and yellow zones have radios to communicate with supervisors, but they are not allowed to coordinate with the van companies primarily because they are dealing with multiple companies, and their job is to enforce the rotation time limits. (*Id.* ¶ 44.) But in the blue zone, the van coordinators deal only with SuperShuttle, are allowed to communicate directly with SuperShuttle, and have SuperShuttle hand-held computers that allow them to directly access SuperShuttle's computer reservations system. (*Id.* ¶ 45.) In effect, in the blue zone, the van coordinators act as agents of SuperShuttle to assist its operations, not enforce the SFO's rules (a conclusion confirmed by some passengers in focus groups in 2013 who thought that the coordinators worked for SuperShuttle). (*Id.*)

By contrast, if no Airport Express van is present, a customer who asks for Airport Express talks to the van coordinator, who calls his supervisor, who then calls Airport Express's dispatch center in San Francisco, which then calls an Airport Express van driver at the offsite location to pick up a passenger. (*Id.* ¶ 47.) Based on years of experience, the supervisor does not call Airport Express and instead the customer is told to take another company's van. (*Id.*) By contrast, when a customer asks for SuperShuttle, either one is there already (since SuperShuttle has so many spaces) or the van coordinator can contact SuperShuttle directly on the hand-held computer to have a van sent. (*Id.*)

**6.  The Discriminatory Effect**

The discriminatory effect on Airport Express is shown by the statistics regarding passengers from SFO (some of which are set forth above) and the share it must bear of costs. (*Id.* ¶ 49.)

SFO tracks and allocates costs among the companies based on the total number of trips the vans make from the staging lot through the terminals each month. (*Id.*) Over the past ten years, Airport Express's percentage of the allocation increased modestly at first but now is essentially the

8

same as a decade ago. (*Id.*) By contrast, SuperShuttle's share increased from 33% to 55% during the same time period. (*Id.*)

Passenger numbers to SFO also illustrate the discriminatory effect. (*Id.* ¶ 50.) Airport Express and American Airporter have almost the same number of vans permitted to operate at SFO: 20 for Airport Express and 21 for American Airporter. (*Id.*) Both service the same geographic area, operate substantially the same way (including with computerized reservations, dispatch center, and website), have been in operation for years, and are family-owned, local companies. (*Id.*) One would expect passenger numbers to and from SFO to be similar for both companies; they are not. (*Id.*) Between 2002 and 2004, American Airporter's passengers were almost evenly split between those traveling to and from SFO; Airport Express's split was 90% to and 10% from SFO. (*Id.* ¶ 51.) The only thing that explains this difference is the zone system; the companies are treated differently. (*Id.*)

The contrast is even greater when the yellow zone (Airport Express) is compared with the blue zone (SuperShuttle) and the red zone (American Airporter). (*Id.* ¶ 52.) In 2011, SuperShuttle's and American Airporter's passengers were almost evenly split between those traveling to SFO and those traveling from SFO; Airport Express's split (by contrast) was 95% traveling to SFO and 5% traveling from SFO.) (*Id.*; *see supra* discussing 2011 passenger statistics.)

The curb-coordination costs are allocated among the shared-ride van service companies based on the number of vans for each company that have exited the van staging lot in a given month to go pick up passengers at SFO. (*Id.* ¶ 53.) This formula benefits SuperShuttle because its vans never leave SFO's terminals empty and almost always leave fuller than other companies, particularly those in the yellow zone (such as Airport Express) that may complete a loop without any passengers or only one passenger. (*Id.*) On a per-passenger basis, there is no question that SuperShuttle pays exponentially less than Airport Express in curb-coordination costs. (*Id.*)

The Airport Commission and Airport Director know this and have done nothing. (*Id.* ¶ 54.) In 2013, the Commission hired a consulting company to assess the shared-ride system. (*Id.*) The consultant concluded that SuperShuttle's curb-coordination costs are effectively being subsidized by the other companies, including Airport Express, for two reasons: 1) costs are not allocated

based on passengers, and thus SuperShuttle benefits from the structural biases created in its favor by the zone system, which allows its vans to never leave empty and almost always to leave fuller than other companies' vans; and 2) even though the companies share the costs of the coordinators, the coordinators act as enforcers of the five-minute rule in the red and yellow zones and as extensions of SuperShuttle in the blue zone. (*Id.*)

The system also benefits SuperShuttle because curb-coordination costs are allocated based on van departures from the staging lots. (*Id.* ¶ 55.) But SuperShuttle is able to bypass the staging lot and loop through SFO to pick up passengers. (*Id.*) By contrast, Airport Express is tagged with a curb-coordination cost event every time it leaves the staging area. (*Id.*) And as described previously, the five-minute rule can result in a return to the staging area without any passengers, triggering a second cost event when Airport Express leaves the staging area for a second circuit. (*Id.*) SuperShuttle's ability to loop results in an under-allocation of curb-coordination costs to SuperShuttle and an over-allocation to Airport Express. (*Id.*) This affects Airport Express's business and financial condition because of the amounts allocated, rising costs, and its inability to object to the costs, the hiring of the private company that employs the van coordinators, or the terms of the contract with the private company. (*Id.* ¶ 56.) Curb-allocation costs paid to the private company are approximately $2.6M annually; Airport Express's share is almost $100,000, which is a significant portion of its annual operating expenses. (*Id.* ¶ 57.) Most of the costs are attributable to the costs for the coordinators at the 12 zones, who have annual budgeted time of 94,200 hours. (*Id.* ¶ 58.) These costs would be reduced by replacing three zones with one, which would reduce the number of coordinators needed by 75%. (*Id.*) Costs have more than doubled in the past eight years, rising from $101,281 per month in March 2006 to $151,761 in March 2010 to more than $210,000 in 2015. (*Id.* ¶ 59.)

In addition to the curb-coordination costs paid by all of the shared-ride van service companies, the companies also pay "loop fees" directly to SFO. (*Id.* ¶ 61.) A loop fee is incurred every time a shared-ride van exits the staging lot to pick up passengers at the SFO terminals or simply enters the terminal area directly from outside SFO to drop off departing passengers without going through the staging lot. (*Id.*) Loop fees are a substantial cost and are almost equal to curb-

coordination costs. (*Id.*) Again, SuperShuttle vans avoid the loop fees because they can loop the airport and do not need to return to the staging lot. (*Id.* ¶ 62.)

SuperShuttle also receives other less tangible benefits as a result of the three-zone system. (*Id.* ¶ 63.) It has more spaces, can park its vans visibly, and gets an advertising bump from its visible, branded vans. (*Id.*) By contrast, Airport Express may have only one van every half hour and can sit for only five minutes. (*Id.*)

SFO's independent consultant hired in 2013 confirms that the three-zone system "is not helpful to customers, drivers, or Airport staff." (*Id.* ¶ 64.) The report discusses the "Perceived Preferential Treatment of SuperShuttle;" "SuperShuttle, which serves over half of all customers, is allowed to operate differently than the other permittees." (*Id.*) The report observes that "[t]he current system has stunted growth for all companies except SuperShuttle" and "[t]he companies who are most limited are those in the yellow zone." (*Id.* ¶ 65.) It confirms that curb-allocation costs are distributed disproportionately across the companies; on per passenger basis, SuperShuttle pays the lowest fees, and Airport Express pays the highest. (*Id.* ¶ 66.)

## GOVERNING LAW

### 1.  Standard of Review for Motions to Dismiss

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief" to give the defendant "fair notice" of what the claims are and the grounds upon which they rest. *See* Fed. R. Civ. P. 8(a)(2); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A complaint does not need detailed factual allegations, but "a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a claim for relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555 (internal citations omitted).

To survive a motion to dismiss, a complaint must contain sufficient factual allegations, accepted as true, "'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

11

defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

If a court dismisses a complaint, it should give leave to amend unless the "the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss and Liehe, Inc. v. Northern California Collection Serv. Inc.*, 911 F.2d 242, 247 (9th Cir. 1990).

**2. The Fourteenth Amendment Claims and Rational-Basis Review**

The general regulatory framework for publicly owned and operated airports (such as SFO) is in California Public Utilities Code §§ 21690.5 to 21690.10. (*See* Motion, ECF No. 12 at 7.) The provisions that are relevant to SFO's promulgation of its zone system for shared-ride vans are sections 21690.5 and 21690.7. Generally they provide that 1) the operation of public airports is essential to the state's welfare, and 2) the governing bodies of the airports must manage the airports to promote commerce and tourism. *See* Cal. Pub. Util. Code §§ 21690.5, 21690.7. More specifically, section 21690.7 provides, "In managing facilities and granting concessions for services to the public, such airport governing bodies shall promote the development of commerce and tourism by (a) securing a diversity of airport services; (b) avoiding wasteful duplication of such services; (c) securing to the users of airports safe, courteous, and quality service; (d) limiting or prohibiting business competition which is destructive of the ends of promoting commerce and tourism in the state; (e) allocating limited airport resources to promote such ends; and (f) fostering California's image as a commercial and tourist center."

Airport Express claims that SFO's zone system (promulgated under SFO's regulatory authority) violates its substantive due-process and equal-protection rights under the Fourteenth Amendment.

The Fourteenth Amendment provides in relevant part, "nor shall any State deprive person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. The Due Process Clause protects

1   procedural and substantive rights; the right alleged here is substantive due process, which protects

2   against arbitrary and capricious government action. *See Albright v. Oliver*, 510 U.S. 266, 272

3   (1994); *Halverson v. Skagit County*, 42 F.3d 1257, 1261 (9th Cir. 1995). The Equal Protection

4   Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of*

5   *Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).

6       The rational-basis test applies here because Airport Express does not assert a fundamental

7   right and is not a member of a suspect class. *See Heller v. Doe*, 509 U.S. 312, 319-20 (1993)

8   (equal protection); *Kim v. United States*, 121 F.3d 1269, 1273 (9th Cir. 1997) (substantive due

9   process). The parties do not dispute this. (Motion, ECF No. 12 at 11; Opposition, ECF No. 14 at

10  13.) Functionally, the rational-basis test is the same for due-process and equal-protection claims.

11  *See Munoz v. Sullivan*, 930 F.2d 1400, 1404-05 & n.10 (9th Cir. 1991). It is "highly deferential."

12  *Kahawaiolaa v. Norton*, 386 F.3d 1271, 1279 (9th Cir. 2004) (quotation omitted).

13      In a rational-basis review of equal-protection claims, the classification is upheld "'if there is a

14  rational relationship between the disparity of treatment and some legitimate government

15  purpose.'" *Id.* (quoting *Heller*, 509 U.S. at 319-20). "[A] classification 'must be upheld against

16  equal protection challenge if there is any reasonably conceivable state of facts that could provide a

17  rational basis for the classification,'" *Heller*, 509 U.S. at 320 (quoting *FCC v. Beach Commc'ns,*

18  *Inc.*, 508 U.S. 307, 313 (1993)), and thus classifications may be set aside "only if they are based

19  on reasons totally unrelated to the pursuit of the State's goals and only if no grounds can be

20  conceived to justify them." *Clements v. Fashing*, 457 U.S. 957, 963 (1982). The government "'has

21  no obligation to produce evidence to sustain the rationality of a statutory classification'; rather,

22  '[t]he burden is on the one attacking the legislative arrangement to negate every conceivable basis

23  which might support it.'" *Kahawaiolaa*, 386 F.3d at 1280 (quoting *Heller*, 509 U.S. at 320). The

24  "'Equal Protection Clause is satisfied so long as there is a plausible policy reason for the

25  classification, the legislative facts on which the classification is apparently based rationally may

26  have been considered to be true by the government decisionmaker, and the relationship of the

27  classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.'" *Id.*

28  (quoting *Nordlinger v. Hahn*, 505 U.S. 1, 11-12 (1992)).

United States District Court
Northern District of California

13

ORDER (No. 3:15-cv-03218-LB)

1   In a rational-basis review of substantive due-process claims, "[i]f a statute is not arbitrary, but

2   implements a rational means of achieving a legitimate governmental end, it satisfies due process."

3   *Kim*, 121 F.3d at 1273 (quotation omitted). Courts "do not require that the [governmental body's]

4   legislative acts actually advance its stated purposes, but instead look to whether the governmental

5   body *could* have had no legitimate reason for its decision." *Kawaoka v. City of Arroyo Grande*, 17

6   F.3d 1227, 1234 (9th Cir. 1994) (quotations omitted) (italics in original). A legislative act "does

7   not violate substantive due process as long as it advances any legitimate public purpose, and if it is

8   at least fairly debatable that the decision to adopt [it] . . . was rationally related to legitimate

9   government interests, the [government's] . . . actions must be upheld." *Id.* (quotations omitted).

10                                              **ANALYSIS**

11   Airport Express claims that SFO's zone system violates its substantive due-process and equal-

12   protection rights under the Fourteenth Amendment because the system discriminates against it in

13   favor of its competitors without a rational or legitimate basis for doing so. (Complaint, ECF No. 1

14   at 20-21, claims one (substantive due process) and two (equal protection).) It seeks an injunction

15   (but not damages) for both claims and also brings a third claim for declaratory relief under the

16   Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and a fourth claim for injunctive relief. (*Id.* at

17   20-23.) The defendants move to dismiss the complaint on two grounds: 1) the claims are barred by

18   the statute of limitations, and 2) Airport Express fails to state Fourteenth Amendment claims

19   because there is a rational basis for the zone system. Because Airport Express alleges continuing

20   violations, the statute of limitations does not bar its claims. The zone system has a rational basis,

21   however, and thus the court grants the motion to dismiss.

22   **1. The Statute of Limitations**

23   A threshold issue is whether the statute of limitations bars the claims. The statute of limitations

24   is two years. *See* Cal. Civ. Proc. Code § 335.1; *Pouncil v. Tilton*, 704 F.3d 568, 573 (9th Cir.

25   2012). The Airport Commission implemented the zone system more than two years before Airport

26   Express filed the lawsuit. But Airport Express seeks declaratory and injunctive relief only for

27   systematic policies that are continuing violations. (Opposition, ECF No. 14 at 10, 12.) The claims

28   thus are not barred by the statute of limitations because Airport Express alleges continuing

United States District Court
Northern District of California

ORDER (No. 3:15-cv-03218-LB)

14

violations and discriminatory acts that occurred within the limitations period. *See The Comm. Concerning Cmty. Improvement v. City of Modesto*, 583 F.3d 690, 701-02 (9th Cir. 2009); *Knox v. Davis*, 260 F.3d 1009, 1013 (9th Cir. 2001). In their reply brief and at oral argument, the defendants agreed that to the extent that Airport Express challenges only acts within the limitation period, its claims are not barred by the statute of limitations. (Reply Brief, ECF No. 15 at 7.)

**2.  Failure to State Fourteenth Amendment Claims**

The defendants assert that Airport Express does not state claims under the Fourteenth Amendment because the zone system is rationally related to legitimate government interests of controlling traffic congestion, allocating limited curb space, improving pedestrian traffic, and minimizing passenger confusion. (Motion, ECF No. 12 at 13.) Moreover, "in allocating companies to particular zones, the Airport draws rational distinctions based on the size of their fleets." (*Id.*) The defendants cite fleet sizes for the competitors in the blue zone (SuperShuttle's 125 vans) and red zone (GO Lorries and American Airporter with 37 and 21 vans respectively) and contrasts the fleet sizes for the yellow-zone van services (Airport Express's 20 vans and unalleged fleet sizes for the other companies). (*Id.*, citing Complaint, ECF No. 1, ¶¶ 34-35.)[3] The defendants note that Airport Express alleges that the zone allocations are "'might be fair and reasonable if the yellow zones . . . were large enough to allow Airport Express . . . to be treated the same as SuperShuttle in the blue zone and the two companies in the red zone.'" (*Id.*, quoting Complaint, ECF No. 1, ¶ 26.) This, the defendants say, is a concession that the allocations are based on size of the companies. (*Id.*)

For purposes of the motion to dismiss, the defendants do not dispute that the zone allocation disadvantages Airport Express. (*Id.* at 14.) Instead, they conclude that alleged economic disadvantage is not constitutionally significant because it is a consequence of SFO's zone system, which in turn is rationally related to SFO's interest in allocating scarce curb space. (*Id.* at 14 &

---

[3] The complaint does not allege the number of vans operated by SuperShuttle and GO Lorries and instead alleges the number of passengers carried per day and the number of passengers carried by van per year; the defendants calculate the number of vans by multiplying the passengers-per-day number by 365 and dividing the result by the passengers-per-van-per-year number. (Motion, ECF No. 12 at 8 n.1.)

United States District Court
Northern District of California

n.4.) All of SFO's zone-allocation decisions − allocating spaces, departure time limits, allocation of walk-up customers, allowing SuperShuttle to loop, use of hand-held computers to communicate with SuperShuttle, and allocation of curb costs − are rationally related to that interest, and all adverse effects to Airport Express result from those decisions. (*Id.* at 14-17). Specifically: 1) it is not irrational to allocate curb space by considering companies' sizes; SuperShuttle is bigger and has more spaces, and Airport Express has fewer; 2) departure-time limits mean that van services in the yellow zones have less ability to fill vans before departing; this is a result of allocating curb space; 3) companies in the blue and red zones get more walk-up customers than van services with fewer vans in the yellow zones; "the Airport could rationally conclude that [the yellow-zone companies] . . . have substantially less ability to allocate passengers . . . ," and a rotating allocation is simple to administer and places a smaller burden on curbside coordinators; 4) looping − and SuperShuttle's preferred status − promote passenger convenience; 5) computer contact directly with SuperShuttle in the blue zone works there but would present logistical difficulties in other zones; and 6) curb-cost allocations are on a per-van basis; the number of vans has the greatest impact on traffic flow, space, and burden on curbside coordinators, and van flow is easy to track; all of this is rationally related to legitimate government interests, even if it results in lower per-passenger costs to SuperShuttle. (*Id.*)

The issue here essentially is whether the adverse effects of the zone system − flowing from SFO's zone system in general and assignment of Airport Express to the yellow zone in particular − are constitutionally significant under rational-basis review. The court concludes that they are not because the zone system − as alleged in the complaint − is rationally related to the legitimate government purpose of controlling traffic (passenger and van) and allocating scarce curb space, both of which relate to SFO's mandate under the Public Utilities Code to manage the airport to promote commerce and tourism by managing services for airport consumers, including by allocating limited airport resources. *See* Cal. Pub. Util. Code § 21690.7. The standard is deferential; the system is presumed valid. *Kawaoka*, 17 F.3d at 1234. The system is "upheld against equal protection challenge [because] there is a[] reasonably conceivable state of facts that could provide a rational basis for the classification." *Heller*, 509 U.S. at 320 (quotation omitted).

ORDER (No. 3:15-cv-03218-LB)

The system "is not arbitrary, but implements a rational means of achieving a legitimate governmental end, [and thus] it satisfies due process." *Kim*, 121 F.3d at 1273 (quotation omitted); *see City of New Orleans v. Dukes*, 427 U.S. 297, 303-05 (1976) (upholding constitutionality of ordinance limiting vendors in the French Quarter to vendors continuously operating for eight years "as a means to preserve the appearance and custom valued by the Quarter's residents and attractive to tourists").

Airport Express nonetheless asserts that it is similar in size and operations to the red-zone American Airporter (as alleged in the complaint) and GO Lorries (not alleged), thus suggesting that the zone system's distinctions are arbitrary. (Opposition, ECF No. 14 at 15-16.) But SFO's system "need only be drawn in such a manner to bear some rational relationship to a legitimate state end." *Clements*, 457 U.S. at 963. "The fact the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration." *United States R.R. Ret. Bd. v. Fritz*, 449 U.S. 166, 179 (1980). The allegations that the zone system is "without rational basis" are otherwise conclusory (*see* Complaint, ECF No. 1, ¶¶ 2, 22, 23, 33, 37, 58, 71, and 77) and thus are "insufficient to overcome the presumption of rationality coupled with the readily apparent justification for the policy." *See Wroblewski v. City of Washburn*, 965 F.2d 452, 460 (7th Cir. 1992). And as discussed in the last paragraph, the purpose of the zone system is readily apparent from the complaint's allegations about allocating space.

Airport Express does allege specifically the economic disadvantage that it suffers from the zone system; that does not change the result either. Rational-basis scrutiny "does not require that legislation that furthers one [government] goal have no adverse side effects." *Munoz*, 930 F.2d at 1401; *see id.* 1406 (upholding statutory rule that a married couple, both eligible for Supplemental Security Income benefits, must receive the lower married-couple rate (rather than the higher single-person rate), for six months after separation); *accord Aleman v. Glickman*, 217 F.3d 1191, 1201-02 (9th Cir. 2000) (collecting cases addressing statutory classifications that discriminate against divorcees in the allocation of federal benefits and rejecting (under rational-basis review) a resident alien's termination of her statutory food-stamp benefits following her divorce).

Airport Express also argues that it has shown enough at the pleadings stage to survive a

1    motion to dismiss. (Opposition, ECF No. 14 at 13-15.) It points to the absence of a record: "the

2    rational relationship defendants urge the Court to adopt is not 'real' and there is no record before

3    the Court to allow it to judge whether defendants' stated objective of controlling traffic at SFO's

4    terminals can be accomplished without engaging in discrimination." (*Id.* at 15; *see also id.* at 13-

5    14.) "How," Airport Express asks, "is the Court then to determine whether defendants'

6    government objective is legitimate?" (*Id.* at 15.) "This is but one example," Airport Express

7    continues, "but it highlights the 'unique challenges' of ruling on the merits of this case at the

8    motion to dismiss stage based solely on the unsupported arguments of lawyers, and not on a fully

9    developed factual record." (*Id.*) The argument is (essentially) that it cannot be the law that its

10   complaint falls based on the unsupported arguments of the defendants' lawyers that the zone

11   system passes the rational-basis test. Instead, Airport Express asserts that the defendants'

12   arguments are premature and must be made as part of a summary-judgment motion. (*Id.* at 13.)

13        The Ninth Circuit has upheld Rule 12(b)(6) dismissals of equal-protection and due-process

14   claims under rational-basis review. *See, e.g., Kahawaiolaa*, 386 F.3d at 1283 (affirming dismissal

15   of challenge to a Department of Interior regulation excluding native Hawaiians from the tribal

16   recognition process for Indian tribes); *Taylor v. Rancho Santa Barbara,* 206 F.3d 932, 935-36 (9th

17   Cir. 2000) (affirming dismissal of challenges to federal and state statutes that permitted landlords

18   to restrict occupancy to persons 55 years old or older). Still, there is a tension in the interplay

19   between the forgiving standard of a "plausible" claim under Rule 12(b)(6) and the "heavy

20   presumption of validity of government conduct inherent in the rational basis standard." *Wolfe v.*

21   *Deeb*, No. C 04-5164 CRB, 2005 U.S. Dist. LEXIS 4873, at *13-14 (N.D. Cal. Mar. 22, 2005).

22   "In defending a statute on rational-basis review, the government 'has no obligation to produce

23   evidence to sustain the rationality of a statutory classification[.]'" *Kahawaiolaa*, 386 F.3d at 1279-

24   80 (quoting *Heller*, 509 U.S. at 320). "The burden is on the one attacking the legislative

25   arrangement to negate every conceivable basis which might support it, whether or not the basis has

26   a foundation in the record." *Heller*, 509 U.S. at 320-21 (citations omitted). Classifications may be

27   set aside "only if they are based on reasons totally unrelated to the pursuit of the State's goals and

28   only if no grounds can be conceived to justify them." *Clements*, 457 U.S. at 963. For a substantive

United States District Court
Northern District of California

1    due-process claim, courts do not require that the policy actually advance the stated purpose;

2    instead, they look to "whether the governmental body *could* have had no legitimate reason for its

3    decision." *Kawaoka*, 17 F.3d at 1234 (quotation omitted).

4        The result of the tension between alleging a plausible claim and rational-basis review is that to

5    survive a motion to dismiss, a plaintiff must allege facts sufficient to overcome the presumption of

6    rationality that applies to government classifications. *See Heller*, 509 U.S. at 320-21; *Wroblewski*,

7    965 F.2d at 459-60; *Chinatown Neighborhood Ass'n v. Harris*, 33 F. Supp. 3d 1085, 1093, 1096-

8    97 (N.D. Cal. Mar. 25, 2014); *Teixeira v. Cty. of Alameda*, No. 12-cv-03288-WHO, 2013 WL

9    4804756, at *9-10 (N.D. Cal. Sept. 9, 2013); *Gordon v. Davenport*, No. C 08-3341 SI, 2009 WL

10   322891, at *6 (Feb. 9, 2009); *Wolfe*, 2005 U.S. Dist. LEXIS 4873, at *13-14.

11       Here, from the face of the complaint, there is a plausible policy reason for the zone system, the

12   need for a system is evident, and the relationship of the system to the goals are not so attenuated as

13   to render the system arbitrary or irrational. *See Kahawaiolaa*, 386 F.3d at 1280. The zone system

14   serves legitimate public purposes, and it is "at least fairly debatable" that the system is "rationally

15   related to legitimate government interests." *Kawaoka*, 17 F.3d at 1234. Airport Express alleged

16   only its economic disadvantage and did not negate the conceivable bases to support the zone

17   system or otherwise overcome the presumption of rationality that attaches to the Airport's decision

18   to implement the zone system. *See Heller*, 509 U.S. at 320-21.

19       Airport Express cites several cases to support its argument that dismissal nonetheless is not

20   appropriate at the pleadings stage. (*See* Opposition, ECF No. 14 at 13.) They do not change the

21   outcome. The first is *Stamas v. Cty. of Madera*; it involved conflicting claims to an easement and

22   issues of fact about the extent of the easement; presumably these affected the court's ability to

23   address the claims. *See* No. CV F 09-0753 LJO SMS, 2010 WL 2556560, at *4-*6 (E.D. Cal. June

24   21, 2010). *Sacramento Cty. Retired Employees Ass'n v. Cty. of Sacramento* was a challenge to a

25   reduction of insurance premiums for retired county employees; the allegations there were that

26   there was no rational basis for the classifications. *See* No. CIV S-11-0355 KJM-EFB, 2012 WL

27   1082807, at *6 (E.D. Cal. Mar. 31, 2012). By contrast, here, the allegations primarily are about

28   unfair impact (and not that there is no "reasonably conceivable state of facts that could provide a

United States District Court
Northern District of California

rational basis for the classification"). *Heller*, 509 U.S. at 320. *Guru Nanak Sikh Soc. of Yuba City, v. Cty. of Sutter* involved the denial of a permit to build a Sikh temple; that case involved potential other non-religious uses of the zoned land that affected whether the rule advanced the stated legislative purpose of harmonizing compatible uses and minimizing traffic. 326 F. Supp. 2d 1128, 1137-38 (E.D. Cal. 2003)).) A lack of contextual facts surrounding the denial of a permit to build a temple is markedly different from the obvious needs for a zone system at a busy airport. And again, the allegations here are mostly that the system is not fair because of its adverse side effects on yellow-zone companies such as Airport Express. That is not enough to defeat a motion to dismiss. *See Munoz*, 930 F.3d at 1406.

At oral argument, Airport Express noted that when courts dismiss complaints on rational-basis review, often there is a robust evidentiary basis to support the defendants' purported rational bases for the governmental actions at issue or a legislative history that sheds light on the basis for the statute or ordinance. That can be true. For example, in *Fields v. Palmdale Sch. Dist.*, the Ninth Circuit upheld a dismissal of parents' challenge to a school survey that touched on sexual topics; in doing so, it noted that "[a]ttached to the complaint is detailed information setting forth the legitimate governmental purpose of the survey and explaining with specificity how the information obtained will be used for educational purposes and how it will ultimately benefit the School District and its children." 427 F.3d 1197, 1209 (9th Cir. 2005). And in upholding a statutory scheme that allowed landlords to rent only to tenants age 55 and older, the Ninth Circuit cited legislative history about the government interest. *See Taylor*, 206 F.3d at 935-36. But these cases do not change the outcome. Courts still dismiss complaints on rational-basis review when there are apparent legitimate government purposes and the plaintiffs do not allege sufficient facts to overcome the presumption of rationality. At the motion to dismiss stage, that means that the plaintiffs must plausibly allege that "'no set of circumstances exists under which the [a]ct would be valid.'" *Teixeira*, 2013 WL 4804756, at * 9-10 (Alameda County ordinance prohibiting gun shops within 500 feet of residential districts, schools, other gun stores, or establishments selling liquor) (quoting *United States v. Salerno v.* 481 U.S. 739, 745 (1987)); *see also Dairy v. Bonham*, No. C-13-1518 EMC, 2013 WL 3829268, at *6-7 (N.D. Cal. July 23, 2013) (challenge to state

United States District Court
Northern District of California

limits on Dungeness crab fishing; "Even in the context of a motion to dismiss, a plaintiff alleging an equal protection violation must plead a claim that establishes that there is not 'any reasonable conceivable state of facts that could provide a rational basis for the classification.'") (quoting *Hettinga v. United States*, 677 F.3d 471, 479 (D.C. Cor. 2012)). That is the case here: there is a legitimate government purpose that is apparent from the complaint.

Airport Express made the related point that, as a practical matter, it is difficult to draft a complaint if one must guess and then negate "every conceivable basis" that might support the zone system. *See Heller*, 509 U.S. at 520. The court is not applying that formulistic a standard; instead, this is a basic assessment of reasonableness in light of the facts about the zone system that are apparent in the complaint. As alleged in the complaint, the zone system has an obvious legitimate government purpose, and Airport Express has not plausibly alleged facts that overcome the presumption of rationality that applies to the system. *See Wroblewski*, 965 F.2d at 460.

As the court discussed with the parties at oral argument, the complaint's allegations suggest that the Airport's own consultants recognize that the system is imperfect and unfair as applied to Airport Express. But "the judiciary may not sit as a superlegislature to judge the wisdom or desirability of legislative [or regulatory] policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines. . . ." *Dukes*, 427 U.S. at 303-04. When, as here, the court concludes that the plaintiff has not plausibly pled that there is no rational basis for the classification, *see Heller*, 509 U.S. at 320, or that the system is arbitrary, *see Kim*, 121 F.3d at 1273, it must dismiss the complaint.

### 3. Declaratory and Injunctive Relief Claims

Claims three and four are for declaratory and injunctive relief and are predicated on claims one and two charging violations of the Fourteenth Amendment. The court thus dismisses them.

*          *          *

United States District Court<br>Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CONCLUSION**

The court dismisses the complaint without prejudice even though it is not sure that the deficiencies can be cured by the allegation of other facts. *See Cook*, 911 F.2d at 247. Airport Express must file any amended complaint within 35 days from the date of this order.

This disposes of ECF No. 12.

**IT IS SO ORDERED.**

Dated: December 3, 2015

_____
LAUREL BEELER
United States Magistrate Judge

ORDER (No. 3:15-cv-03218-LB)